# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| ANTHONY IVAN BOBADILLA, | ) | Case No. CV 14-3623-JEM |
|  | ) |  |
| Petitioner, | ) |  |
|  | ) | MEMORANDUM OPINION AND ORDER |
| v. | ) | DENYING PETITION FOR WRIT OF |
|  | ) | HABEAS CORPUS AND DENYING |
| JOE A. LIZARRAGA, Warden, | ) | CERTIFICATE OF APPEALABILITY |
|  | ) |  |
| Respondent. | ) |  |

## **INTRODUCTION**

On May 12, 2014, petitioner, a California state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. On November 7, 2014, respondent[1] filed a Return to the Petition ("Return"). On December 4, 2014, petitioner filed a Reply to the Return ("Reply").

Having reviewed the allegations in the Petition, as well as the matters set forth in the record, the Return and the Reply, the Petition is denied and the action is dismissed with prejudice.

---

[1] Joe A. Lizarraga, the Warden of the Mule Creek State Prison located in Ione, California, where petitioner is currently incarcerated, is substituted as the proper respondent in this case. See Fed. R. Civ. P. 25(d); Brittingham v. United States, 982 F.2d 378, 379 (9th Cir. 1992) (the proper respondent in a federal habeas petition is the petitioner's "'immediate custodian,'" typically the warden of his prison).

**PRIOR PROCEEDINGS**

In Los Angeles County Superior Court case number KA092622, a jury convicted petitioner of attempted willful, deliberate, and premeditated murder (Cal. Penal Code §§ 664, 187(a)) and assault with a deadly weapon (Cal. Penal Code § 245(a)(1)). As to both offenses, the jury found that petitioner personally inflicted great bodily injury under circumstances involving domestic violence (Cal. Penal Code § 12022.7(e)). As to the attempted murder, the jury found that petitioner personally used a deadly and dangerous weapon (Cal. Penal Code § 12022(b)(1)). (Respondent's Lodged Documents ("LD") 1 at 127-28.) The trial court sentenced Petitioner to state prison for a term of life with the possibility of parole plus five years. (LD 1 at 154-55.)

Petitioner appealed the judgment of conviction to the California Court of Appeal. (LD 3.) On May 23, 2013, the California Court of Appeal affirmed the judgment of conviction in a reasoned opinion. (LD 5.) Petitioner then filed a petition for review in the California Supreme Court. (LD 6.) On August 14, 2013, the California Supreme Court denied review without comment or citation to authority. (LD 7.)

**SUMMARY OF FACTS**[2]

*Prosecution Case*

*1. The dating relationship between Bobadilla and Jasmine*

Bobadilla and Jasmine began dating in early 2010 when Bobadilla was 16 years old, and Jasmine was 15 years old, and he began living with Jasmine's family in January or February 2010.

Jasmine's family included her parents Tim and Diane, and a cousin,

---

[2] The Court quotes directly from the statement of facts in the California Court of Appeal's Opinion. The Court "presume[s] that the state court's findings of fact are correct unless [p]etitioner rebuts that presumption with clear and convincing evidence. Petitioner has not . . . overcome the presumption with respect to the underlying events. [The Court] therefore rel[ies] on the state court's recitation of the facts." Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008), cert. denied, 129 S.Ct. 926 (2009) (citations omitted); 28 U.S.C. § 2254(e)(1). "This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court." Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir. 2001), amended by, 253 F.3d 1150 (9th Cir. 2001); Pollard v. Galaza, 290 F.3d 1030, 1035 (9th Cir.), cert. denied, 537 U.S. 981 (2002).

Anthony. Bobadilla and Jasmine shared a bedroom and were sexually active.

The couple frequently argued, "usually about the same thing, . . . jealousy issues." They accused one another of cheating or wanting to be with someone else. Bobadilla told Jasmine that "if he couldn't be with [her] then nobody else could." The arguments worsened over time. Bobadilla told Jasmine he would never let her leave him. Jasmine's cousin Anthony, who had seen Bobadilla go through Jasmine's cell phone and question her on occasion, described Bobadilla's behavior toward Jasmine as protective, obsessive and controlling. Jasmine occasionally threatened to break up with Bobadilla. Afterwards, Bobadilla would intentionally hurt himself, including cutting or trying to strangle himself, and Jasmine felt sorry for him and remained in the relationship. Bobadilla repeatedly told Jasmine that she "couldn't live without [him]."

*2. Bobadilla attacks Jasmine*

On August 9, 2010, Jasmine and her parents went to a family birthday celebration. Bobadilla stayed home. When Jasmine and her parents returned late that evening, Bobadilla accused Jasmine of having gone to see someone else instead of attending the family gathering. Jasmine did not argue with or pay attention to Bobadilla, which made him angrier. Fed up with arguing about such things, Jasmine told Bobadilla she wanted to break up with him and suggested they just remain friends. He said, "'we're not going to do that,'" and told her if he could not be with her, no one could.

Jasmine told Bobadilla they would talk about him leaving her house in the morning, and turned away from him to go to sleep. Bobadilla aggressively threatened Jasmine that she "better not go to

sleep." She ignored him and fell asleep, which made him angrier. Jasmine woke up in pain to Bobadilla aggressively touching her vagina, and accusing her of dreaming about someone else. She pushed him away and went back to sleep.

Bobadilla woke Jasmine again by rolling her over and making her assume a kneeling position on the bed. Facing her, Bobadilla began hitting Jasmine with a bat multiple times. Jasmine had never seen the bat in their room before. Bobadilla struck Jasmine multiple times on her head and face. The final blow dislodged Jasmine from a kneeling position. In pain, Jasmine "screamed for [her] life." Bobadilla stopped hitting her and sat on the edge of the bed.

Jasmine's parents were awakened by Jasmine's scream. The door to Jasmine's room was locked, which was unusual, and they forced it open. Jasmine was lying on her back on the bed. Bobadilla was kneeling on the bed and stared at Diane with a blank expression.

Diane approached Bobadilla and asked him, "What happened? What's going on?" She asked Bobadilla if he hit Jasmine, and he nodded his head yes. Jasmine held her face and screamed. Diane and Jasmine saw Bobadilla hit himself with the bat. Diane got a towel for Bobadilla, who was bleeding from his head. Bobadilla walked over to Jasmine's purse and opened it. Diane took the purse away from him. Jasmine screamed for her mother. Diane ran to aid Jasmine, who ran from the room, afraid for her life.

Anthony was also awakened by Jasmine's scream. As he ran from his room he saw Jasmine and Diane leaving Jasmine's room. Anthony went into Jasmine's room; there was blood everywhere. Anthony found Bobadilla in the bathroom, bleeding. When Anthony asked him what happened, Bobadilla walked past Anthony saying, "I'm

as good as dead anyways." There was a bat on the floor. Bobadilla retrieved a piece of broken glass from the mirror and sliced his wrist. Anthony said to Bobadilla, "[w]hat are you doing? What's wrong with you? Stop. Stop." Bobadilla stared blankly.

Anthony called the police, and told Bobadilla to stay in the bedroom. When Anthony returned to Jasmine's room after retrieving his cell phone, Bobadilla was gone. He had gone out the window. Anthony followed a trail of blood to chase after Bobadilla, and found a hand print on a back wall that Bobadilla had jumped over. Anthony jumped over the wall but lost sight of Bobadilla sometime between 1:00 a.m. to 2:00 a.m.

Police officers arrived at Jasmine's house at approximately 3:30 a.m. but were unable to find Bobadilla. An officer photographed a dumpster containing wet blood, located in a parking lot about 100 yards from Jasmine's back yard.

*3. Jasmine's injuries and Bobadilla's apprehension*

Diane took Jasmine to the hospital. Jasmine's face was swollen and her face and scalp were bleeding. She had received an orbital bone fracture and two lacerations, one on her scalp, for which she received nine staples, and one on her temple which was sealed with medical adhesive. As a result of her injuries, Jasmine had scars near her eye and the side of her head. She also had severe migraines and a lot of pain in her head as a result of the beating.

Anthony found Bobadilla behind a wall in back of Jasmine's house between 5:00 a.m. and 6:00 a.m. Bobadilla had changed his clothes. He approached Anthony holding a pair of pruning shears. The police arrived and arrested Bobadilla, who was compliant. Bobadilla was treated for his wounds and transferred to a psychiatric hospital.

*4. Bobadilla's letters*

Jasmine and her family moved out of their residence several months after the attack. While moving, Jasmine found three letters in her room that Bobadilla had written, which she gave to the police. The first two were hidden behind dressers. The third was on the bottom of a basket in which Bobadilla had kept his belongings.

The first letter (Peo. Exh. 10), dated February 22, 2010, reads as follows:

"How can I trust if there's no trust in her, in her eyes? I'll never cheat or lie to her. She's my love. I don't trust because she talks to other vatos. Man, if she ever cheats on me with my vato, I would cut their balls off and her eye and switch them and cut her nose off and replace it with his dick. [¶] I'll kill that vato, breaking his arms and legs. I'll take out his inside and feed them to Jasmine since she won't see. [¶] Fuck, I kill her too after she gets beat up by my fists and heel and then I'll kill her and me. [¶] I love you so much. I only want her for me and only me."

The second letter (Peo. Exh. 11) entitled "Suicide Note 2 Jasmine," reads:

"When I die, plz don't cry. I would be in the sky. So you could stay alive, just get high, to remeber [sic] the good times that we had at night without any lights when we made love with all our might!!! I tell you this bcuz [sic] I have a suicide mind; but instead just comeitd [sic] homicide bcuz you said I lied but all you do is make me cry[.] All you do is run your mind[.] I love you so good bye. So this is my life to not be alive, I just wana [sic] die!!!! with a tear in my eye now you won't have me by ur [sic] side but you guna [sic] have another in your life so I said

fuck!!! I want you back. [B]ut we can't, so watch your back (anybody killa [sic] ).”

The third (Peo. Exh. 12), dated July 13, 2010, entitled "My Death Letter," states:

"If you find this letter its [sic] cuz [sic] I'm dead and so is Jasmine, yes I killed her for so many reasons I can't trust that "'slut'" I love her but she aint [sic] gona [sic] change her ways she told me herself, she loves to fuck! . . . She lie's [sic] about who she fucks she has a dipped in back, she does'nt [sic] even want me she is using me she don't fuckn [sic] love me so I killed her so we can go together in the light so I can trust her. [¶] She wouldn't kill herself if I ever died I would for her if she ever died. [¶] She said she would change but haven't seen changes she still talks, write's [sic], and think about sex & lust fuck her she thinks I'm her fool. Now chales she fucked with the wrong vato I was born to kill since I was fucked up in the head. [¶] Sorry I didn't mean for this to happen but Jasmine hurt me to the point I want to kill her I did it for love."

*Defense case*

Bobadilla testified in his own defense. Before he met Jasmine, Bobadilla tried to kill himself more than once. After they began living together, Bobadilla and Jasmine regularly accused one another of cheating. Jasmine scratched Bobadilla on three or four occasions, and also hit or slapped him three times. She was jealous of a woman named Marina, about whom Bobadilla and Jasmine frequently argued. Bobadilla was jealous of Jasmine, and his jealousy made him angry and sad. He wrote letters to relieve stress over such feelings, but never meant to kill Jasmine.

When Jasmine returned home on August 8, 2010, she accused Bobadilla of leaving the house and being with other girls in her absence. Bobadilla and Jasmine then watched television and had intercourse. After they had sex, Jasmine told Bobadilla he "looked too happy" and asked who he was thinking about. Bobadilla said he was thinking of her, but Jasmine accused him of lying and thinking about Marina. She told Bobadilla he disgusted her, that she did not like the way he made her feel when they had sex and that she would stick to the people who made her feel good. This information caused Bobadilla to feel very bad.

Jasmine went to sleep. When Bobadilla tried to hug and kiss her and tell her that he loved her, he saw that Jasmine was masturbating. She told Bobadilla that he was "ruining the moment right now," and that she was thinking of some other guy. Bobadilla was heartbroken and could take no more. He grabbed a bat to go outside and hit stuff to relieve his frustration. Jasmine asked him where he was going, and tried to slap or scratch him. Bobadilla reacted by swinging the bat at Jasmine, hitting her in the head. He hit her again in the head or face. Bobadilla lost control and was not in his right state of mind. Bobadilla said he had not tried to kill Jasmine. He stopped hitting her when she screamed, dropped the bat on the bed, and hugged Jasmine and asked if she was okay. Jasmine's parents broke down the door and asked Bobadilla what he had done. Bobadilla did not recall telling Diane he hit Jasmine. He struck himself in the head three times to punish himself for hurting Jasmine; her parents had to stop him.

After Anthony came into the room Bobadilla stabbed himself in the wrist multiple times with glass shards. Bobadilla left the house through a window after Anthony said he was calling the police. He went

into a parking lot behind the backyard and hid in a dumpster when he
saw Jasmine's father and cousin chasing him. Bobadilla returned to
Jasmine's house after the sun rose. He had changed his clothes and
picked up "cutters" so he could cut his throat. Bobadilla saw Anthony
and asked if Jasmine was okay; Anthony did not reply. When the police
arrived and asked Bobadilla to put the clippers down, he complied.

In early October 2010, Jasmine and her father contacted the
police regarding a letter Jasmine found in a basket in her room.
Jasmine told the police Bobadilla had told her that, if he ever killed
himself, she would find a letter entitled "My Death Letter." In November
2010, Jasmine gave police a letter entitled " Suicide Note 2 Jasmine."
(Peo. Exh. 11.) She had found the letter behind a dresser in her room
where Bobadilla had hidden it. She said Bobadilla hid several letters
throughout the house, and intended her to "find them after he was
gone."

(LD 5 at 2-7).

## PETITIONER'S CONTENTIONS

In his Petition, petitioner challenges his conviction and sentence, (Petition at 2), and
raises the following claim for federal habeas relief:

    1.    There was insufficient evidence of premeditation and deliberation to support
petitioner's conviction for attempted murder.  (Petition at 5; id., Exhibit ("Exh.") D).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the
Court's consideration of petitioner's cognizable federal claims.  28 U.S.C. § 2254(d), as
amended by AEDPA, states:

An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to
any claim that was adjudicated on the merits in State court proceedings unless

the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the United States Supreme Court held that a state court's decision can be contrary to federal law if it either (1) fails to apply the correct controlling authority, or (2) applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result.  <u>Id.</u> at 405-06.  A state court's decision can involve an unreasonable application of federal law if it either (1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable.  <u>Id.</u> at 407-08.  The Supreme Court has admonished courts against equating the term "unreasonable application" with "clear error."  "These two standards . . . are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  <u>Lockyer v. Andrade</u> (<u>Andrade</u>), 538 U.S. 63, 75 (2003).  Instead, in this context, habeas relief may issue only if the state court's application of federal law was "objectively unreasonable."  <u>Id.</u>  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  <u>Harrington v. Richter</u>, 131 S.Ct. 770, 786 (2011).

Under AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision."  <u>Williams</u>, 529 U.S. at 412 ("§ 2254(d)(i) restricts the source of clearly established law to this Court's jurisprudence"); <u>see also</u> <u>Andrade</u>, 538 U.S. at 71.  If there is no Supreme Court precedent that controls a legal issue raised by a habeas petitioner in state court, the state court's decision cannot be

1   contrary to, or an unreasonable application of, clearly established federal law.  Wright v. Van

2   Patten, 552 U.S. 120, 125-26 (2008) (per curiam); see also Carey v. Musladin, 549 U.S. 70,

3   76-77 (2006).  A state court need not cite or even be aware of the controlling Supreme

4   Court cases, "so long as neither the reasoning nor the result of the state-court decision

5   contradicts them."  Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam); see also Bell v. Cone,

6   543 U.S. 447, 455 (2005) (per curiam).

7          Here, petitioner raised the claim in the instant Petition in his petition for review in the

8   California Supreme Court.  The California Supreme Court's discretionary decision to deny

9   Petitioner's petition for review without comment or citation to authority was not a decision on

10  the merits.  See Greene v. Fisher, 132 S.Ct. 38, 45 (2011) (state supreme court's decision

11  not to hear an appeal is not an adjudication on the merits under § 2254(d)(1)); Camper v.

12  Workers' Comp. Appeals Bd., 3 Cal.4th 679, 689 n. 8 (1992) ("[W]e reiterate the

13  well-established rule in this state that a denial of a petition for review is not an expression of

14  opinion of the Supreme Court on the merits of the case.").  "Where there has been one

15  reasoned state judgment rejecting a federal claim, later unexplained orders upholding that

16  judgment or rejecting the same claim rest upon the same ground."  Ylst v. Nunnemaker, 501

17  U.S. 797, 803 (1991); Medley v. Runnels, 506 F.3d 857, 862 (9th Cir. 2007) (en banc), cert.

18  denied, 552 U.S. 1316 (2008).  Thus, in addressing petitioner's claim, the Court will consider

19  the reasoned opinion of the California Court of Appeal, which denied the claim on the

20  merits.  See Maxwell v. Roe, 606 F.3d 561, 568 (9th Cir. 2010); Vasquez v. Kirkland, 572

21  F.3d 1029, 1035 (9th Cir. 2009), cert. denied, 130 S.Ct. 1086 (2010).

22                                          **DISCUSSION**

23  **I.     GROUND ONE DOES NOT WARRANT FEDERAL HABEAS RELIEF.**

24         In Ground One, petitioner claims that there was insufficient evidence to support his

25  conviction for willful, deliberate and premeditated attempted murder.  (Petition at 5; id., Exh.

26  D).

27  / / /

28  / / /

A.    Applicable Law.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  However, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005), cert. denied, 546 U.S. 1137 (2006).  In particular, to review the sufficiency of the evidence in a habeas corpus proceeding, the Court must determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Lewis v. Jeffers (Jeffers), 497 U.S. 764, 781 (1990) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (italics in original). All evidence must be considered in the light most favorable to the prosecution, Jeffers, 497 U.S. at 782; Jackson, 443 U.S. at 319, and if the facts support conflicting inferences, reviewing courts "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326; McDaniel v. Brown, 130 S.Ct. 665, 673 (2010) (per curiam).  These standards are applied to the substantive elements of the criminal offenses under state law. See Jackson, 443 U.S. at 324 n.16; Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir.) (en banc), cert. denied, 543 U.S. 956 (2004).

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." People v. Superior Court, 41 Cal.4th 1, 7 (2007); People v. Lee, 31 Cal.4th 613, 623 (2003), cert. denied sub nom., Xiong v. California, 541 U.S. 947 (2004).  "There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions." People v. Smith, 37 Cal.4th 733, 741 (2005) (citation and internal quotation marks omitted); see also People v. Ramos, 121 Cal.App.4th 1194, 1207-08 (2004) ("Generally, the question whether the defendant harbored the required intent must be inferred from the circumstances of the shooting.").  Although motive is not an element of

1    attempted murder, it can be evidence of an intent to kill.  See Smith, 37 Cal.4th at 740-41.

2    Furthermore, "the crime of attempted murder is not divided into degrees."  Id. at 740; People

3    v. Bright, 12 Cal.4th 652, 665-69 (1996), cert. denied, 518 U.S. 1006 (1996), overruled on

4    other grounds, People v. Seel, 34 Cal.4th 535 (2004).  Rather, "[t]he prosecution may seek

5    a jury finding that an attempted murder was 'willful, deliberate, and premeditated' for

6    purposes of sentence enhancement."  Smith, 37 Cal.4th at 740; see Bright, 12 Cal.4th at

7    669; P.C. §§ 189,[3] 664(a).[4]

8         Premeditation and deliberation require more than an intent to kill,[5] People v. Young,

9    34 Cal.4th 1149, 1182 (2005), cert. denied, 546 U.S. 833 (2005); People v. Cole, 33 Cal.4th

10   1158, 1224 (2004), cert. denied, 544 U.S. 1001 (2005); rather, they "must result from careful

11   thought and weighing of considerations."  People v. Manriquez, 37 Cal.4th 547, 577 (2005),

12   cert. denied, 547 U.S. 1179 (2006) (citation and internal quotation marks omitted); see

13   People v. Koontz, 27 Cal.4th 1041, 1080 (2002), cert. denied, 537 U.S. 1117 (2003).  Yet,

14   _____

15        [3]  Cal. Penal Code § 189 provides that "[t]o prove the killing was 'deliberate and
     premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected
16   upon the gravity of his or her act."

17        [4]  Cal. Penal Code § 664(a) provides that:

18            If the crime attempted is punishable by imprisonment in the state prison, . . .
              the person guilty of the attempt shall be punished by imprisonment in the state
19            prison . . . for one-half the term of imprisonment prescribed upon a conviction
              of the offense attempted.  However, if the crime attempted is willful,
20            deliberate, and premeditated murder, as defined in Section 189, the person
              guilty of that attempt shall be punished by imprisonment in the state prison for
21            life with the possibility of parole.  If the crime attempted is any other one in
              which the maximum sentence is life imprisonment or death, the person guilty
22            of the attempt shall be punished by imprisonment in the state prison for five,
              seven, or nine years.  The additional term provided in this section for
23            attempted willful, deliberate, and premeditated murder shall not be imposed
              unless the fact that the attempted murder was willful, deliberate, and
24            premeditated is charged in the accusatory pleading and admitted or found to
              be true by the trier of fact.
25

26        [5]  California courts do not distinguish between attempted murder and first degree murder for
     purposes of determining whether there is sufficient evidence of premeditation and deliberation.  See
27   People v. Brito, 232 Cal.App.3d 316, 323 (1991) (applying the three-prong test set forth in People v.
     Anderson, 70 Cal.2d 15, 26-27 (1968) to analyze the sufficiency of evidence of deliberation and
28   premeditation to support a conviction of premeditated murder to a claim that the evidence was not
     sufficient to support an attempted murder conviction).

1    "[t]he process of premeditation and deliberation does not require any extended period of

2    time.  The true test is not the duration of time as much as it is the extent of the reflection.

3    Thoughts may follow each other with great rapidity and cold, calculated judgment may be

4    arrived at quickly[.]"  Manriquez, 37 Cal.4th at 577 (citations and internal quotation marks

5    omitted); see People v. Lenart, 32 Cal.4th 1107, 1127 (2004).

6            Three types of evidence are indicative of premeditation and deliberation:

7                    They are "(1) facts about how and what defendant did *prior* to the actual

8                    killing which show that the defendant was engaged in activity directed

9                    toward, and explicable as intended to result in, the killing – what may be

10                   characterized as 'planning' activity; (2) facts about the defendant's *prior*

11                   relationship and/or conduct with the victim from which the jury could

12                   reasonably infer a 'motive' to kill the victim, which inference of motive,

13                   together with facts of type (1) or (3), would in turn support an inference

14                   that killing was the result of 'a pre-existing reflection' and 'careful

15                   thought and weighing of considerations' rather than 'mere unconsidered

16                   or rash impulse hastily executed' [citation]; (3) facts about the nature of

17                   the killing from which the jury could infer that the *manner* of killing was

18                   so particular and exacting that the defendant must have intentionally

19                   killed according to a 'preconceived design' to take his victim's life in a

20                   particular way for a 'reason' which the jury can reasonably infer from

21                   facts of type (1) or (2)."

22   Lenart, 32 Cal.4th at 1127 (quoting People v. Anderson, 70 Cal.2d 15, 26-27 (1968))

23   (emphasis in original); see Young, 34 Cal.4th at 1182-83.  However, "[t]he categories of

24   evidence identified in *Anderson* . . . do not represent an exhaustive list of evidence that

25   could sustain a finding of premeditation and deliberation, and the reviewing court need not

26   accord them any particular weight."  Young, 34 Cal.4th at 1183 (italics in original); see

27   Manriquez, 37 Cal.4th at 577.

28   / / /

B.     Analysis.

In Ground One, petitioner claims there was insufficient evidence to support his conviction for deliberate and premeditated attempted murder.  (See Petition at 5; id., Exh. D).  He contends that "[t]he evidence . . . showed an unplanned assault committed out of anger and jealousy, not one committed after petitioner carefully weighed the consequences."[6]  (Petition, Exh. D at 4 (stating the evidence "failed to show that the petitioner engaged in any planning activity, that he had a strong motive to kill Jasmine, or he committed the assault in a cold, calculated manner")).)  The California Court of Appeal rejected this claim, stating as follows:

> Bobadilla argues that, under the *Anderson* factors, there was no evidence of planning, little evidence that he had a motive to kill Jasmine, and nothing methodical about his attack to suggest premeditation and deliberation. The factors are disjunctive, and no single factor carries definitive weight. (*People v. Pride* (1992) 3 Cal.4th 195, 247; *People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) They are not exclusive and no specific combination of factors need be present to conclude there is substantial evidence to support findings of premeditation and deliberation. (*People v. Stitely* (2005) 35 Cal.4th 514, 543; *People v. Koontz* (2002) 27 Cal.4th 1041, 1081 (*Koontz*).) The issue on appeal is simply whether a jury reasonably could find an attempted killing resulted from preexisting reflection, rather than an unconsidered and rash impulse. (*People v. Hughes* (2002) 27 Cal.4th 287, 342; *People v. Young* (2005) 34 Cal.4th 1149, 1183.)
>
> Nevertheless, considering the *Anderson* guideline factors and the entire record, we conclude substantial evidence supports the jury's

---

[6]  Under California law, the crime of murder is reduced to voluntary manslaughter when the unlawful killing of a human being is committed without malice "upon a sudden quarrel or heat of passion."  Cal. Penal Code § 192(a) (2007).

finding that Bobadilla's attempted murder of Jasmine was premeditated and deliberate. To the extent Bobadilla points to contrary evidence and contrary inferences to support his claim there is insufficient evidence to support the jury's finding, he misapplies the substantial evidence standard of review.

As to the first *Anderson* factor, Bobadilla maintains there was no evidence of planning because he did not lure Jasmine somewhere after arming himself with a weapon, did not lock the bedroom door as part of a plan of attack, and his letters do not illustrate a "specific scheme or plan for killing Jasmine." This argument is meritless and ignores the applicable standard of review: We "must accept [all] logical inferences that the jury might have drawn from the . . . evidence," not Bobadilla's selective interpretation of that evidence on appeal. (See *People v. Maury*, *supra*, 30 Cal.4th at p. 396.)

First, when Bobadilla woke Jasmine and forced her to her knees, he was waiting, armed with a bat she had never before seen in the room the couple had shared for five months. A defendant's act of arming himself with a weapon is evidence of planning activity for purposes of determining whether substantial evidence supports the jury's finding of premeditation and deliberation. (*Koontz*, *supra*, 27 Cal.4th at pp. 1081-1082; *People v. Perez* (1992) 2 Cal.4th 1117, 1126.) The jury could reasonably infer that Bobadilla brought the bat into the room as part of his plan to attack Jasmine.

Second, the door to the bedroom was locked during the attack and Jasmine's parents had to break it open to get in. Both Jasmine and her mother testified that it was unusual for Jasmine's bedroom door to be locked. Again, the jury could reasonably conclude that Bobadilla locked the bedroom door before the attack to keep Jasmine inside the

room, and/or to prevent Jasmine's family members from getting in to help her or to stop the attack. "Like first degree murder, attempted first degree murder requires a finding of premeditation and deliberation." (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1223-1224, fn. omitted.) "Deliberation" refers to careful weighing of considerations in forming a course of action. "Premeditation" means """considered beforehand.""" (*People v. Lee*, *supra*, 51 Cal.4th at p. 636.) "'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.""" (*Ibid.*)

Although perhaps not overwhelming, substantial evidence supports the jury's finding that Bobadilla had deliberated and premeditated before attacking Jasmine. Planning activity is shown by the evidence that he woke Jasmine twice after their confrontation about the breakup of their relationship and waited for her to wake, armed with a bat. The manner of the assault, swinging a bat multiple times at Jasmine's face and head, also indicates calculation. Sufficient evidence supports a reasonable inference that Bobadilla's attempt to beat Jasmine to death with a bat was the result of planning and "preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*People v. Perez*, *supra*, 2 Cal.4th at p. 1125.) The prosecution presented ample evidence of planning activity.

Regarding the second *Anderson* factor, substantial evidence supports a reasonable inference that Bobadilla had a motive to kill Jasmine. Bobadilla's letters demonstrate his motive to kill Jasmine. Quite simply, he was jealous and undone by the thought that Jasmine

was or might be interested in any man other than him. Just before the attack, Bobadilla told Jasmine that if he could not be with her, no one could. Bobadilla's motive was clear: he wanted to kill Jasmine because he was jealous that she was interested in sex with other men, and so she could never be with anyone but him.

The evidence supports a finding of motive and planning activity. (*Anderson*, *supra*, 70 Cal.2d at pp. 26–27.) The fact that Bobadilla brought a bat into the room with him after a jealous confrontation with Jasmine during which she hurt his feelings and pride, and stood waiting with that weapon while she woke and sat up, shows planning activity and motive. As stated in *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102, "the law does not require that a first degree murderer have a 'rational' motive for killing. Anger at the way the victim talked to him [citation] . . . may be sufficient [citation]." (See also *People v. Proctor* (1992) 4 Cal.4th 499, 529 [motive not clear].) "[T]he incomprehensibility of the motive does not mean that the jury could not reasonably infer that the defendant entertained and acted on it. [Citation.]" (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1238.)

Bobadilla concedes that his letters contain "some evidence of motive," but maintains the evidence is inconsistent because they also express his love for Jasmine. Again, Bobadilla simply ignores the rule that all evidentiary conflicts must be resolved in favor of the judgment. His argument is rejected.

Finally, Bobadilla claims there is insufficient evidence of premeditation and deliberation because there was nothing "'methodical'" about his attack on Jasmine. He is wrong.

Before she went to sleep, Jasmine told Bobadilla she wanted to end their romantic involvement, and said they would discuss his move

1    out of her house the next morning. Bobadilla threatened Jasmine that

2    she better not sleep. She did not argue with or resist Bobadilla, but

3    ignored him and went to sleep. After Jasmine was asleep, Bobadilla

4    woke her up painfully by aggressively touching her vagina, and

5    expressed his jealousy when he believed she was fantasizing about

6    someone else. Jasmine went back to sleep. Bobadilla woke Jasmine

7    again, forced her to her knees, waited for her to sit up and then hit her

8    repeatedly in the head with the bat he held at the ready. These events

9    readily demonstrate premeditation and deliberation. In addition, "[t]he

10   utter lack of provocation by the victim is a strong factor supporting the

11   conclusion that appellant's attack was deliberately and reflectively

12   conceived in advance." (*People v. Lunafelix*, *supra*, 168 Cal.App.3d at

13   p. 102.)

14          Substantial evidence supports the jury's conclusion that the

15   attempted murder was committed with premeditation and deliberation.

16   (Opinion at 12-14) (citations omitted).

17          The California Court of Appeal reasonably concluded that sufficient evidence

18   supported the jury's finding that petitioner was guilty of deliberate and premeditated

19   attempted murder.  The jury heard testimony that, prior to the attack, petitioner and Jasmine

20   had verbal arguments "usually about the same thing, . . . jealousy issues." (LD 2 at 624-25.)

21   Over time, their arguments became worse and petitioner repeatedly told Jasmine that if he

22   could not be with her then no one else could be with her.  (LD 2 at 625, 630.)  Petitioner

23   wrote in his letters that he did not trust Jasmine and would kill her if she cheated on him.

24   (LD 2 at 656; see LD 1 at 97.)  Jasmine testified that petitioner jealously confronted her on

25   the night of the attack and accused her of lying about her whereabouts that day.  (LD 2 at

26   627-29.)  Jasmine told petitioner that they were better off "just being friends," that she

27   wanted him to leave her house, and that they would talk about it in the morning.  (LD 2 at

28   630, 633.)  Petitioner became angry and threatened Jasmine that she better not go to sleep.

(LD 2 at 630-31, 633.)  After Jasmine went to sleep, petitioner woke her up by aggressively touching her vagina. (LD 2 at 633-34.)  Petitioner asked Jasmine if she was dreaming of someone.  (LD 2 at 635).  After Jasmine fell back to sleep, petitioner woke Jasmine up, made her sit on her knees, and then hit her in the head and face multiple times with a bat. (LD 2 at 635-41.)  Jasmine had never previously seen a bat in the room that they shared and she did not know where the bat was stored or where it came from.  (LD 2 at 642.)  Both Jasmine and her mother testified that the bedroom door was locked when petitioner attacked Jasmine, that Jasmine's father had to break it open, and that it was unusual for the bedroom door to be locked. (LD 2 at 640, 727.)

Under the circumstances, the evidence presented to the jury is more than sufficient to support a finding of premeditation and deliberation.  See United States v. Larios, 640 F.2d 938, 940 (9th Cir.1981) ("The testimony of one witness . . . is sufficient to uphold a conviction.") (citations omitted); Bruce v. Terhune, 376 F.3d 950, 957-58 (9th Cir. 2004) (per curiam) (same); Marshall v. Lonberger, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").  First, the jury heard evidence from which it could infer that petitioner planned his attack by arming himself with a bat, locking the doors, waking Jasmine up, and attacking her without warning with the bat.  (LD 2 at 635-42, 727); Koontz, 27 Cal.4th at 1081-82 (sufficient evidence of planning when defendant armed himself and followed victim); People v. Elliot, 37 Cal.4th 453, 471 (2005), cert. denied, 549 U.S. 853 (2006) ("that defendant armed himself prior to the attack supports the inference that he planned a violent encounter.") (citation and internal quotation marks omitted); see also People v. Romero, 44 Cal.4th 386, 401 (2008), cert. denied, 555 U.S. 1142 (2009) ("[T]here is evidence from which the jury could infer planning.  Defendant brought a gun to the video store where, without any warning or apparent awareness of the impending attack, [the victim] was shot in the back of the head.") (italics omitted).

Second, the testimony concerning petitioner's jealousy, in particular evidence showing that petitioner threatened and jealously confronted Jasmine in the hours preceding

1   the attack, is sufficient to establish that petitioner had a motive to kill Jasmine.  (See LD 2 at

2   624-25, 627-31, 633, 656; LD 1 at 97); Manriquez, 37 Cal.4th at 577 (evidence showing that

3   defendant had "engaged in a [prior] verbal altercation" with the victim supports finding of

4   premeditation and deliberation); see also People v. Jackson, 49 Cal.3d 1170, 1200 (1989),

5   cert. denied, 498 U.S. 881(1990) ("[T]he law does not require that a first degree murderer

6   have a rational motive for killing.  Anger at the way the victim talked to him may be

7   sufficient.") (citation, ellipsis and internal quotation marks omitted).

8        Finally, the cold and calculated manner of petitioner's attack, which included waking

9   Jasmine up, lifting her to her knees, and repeatedly hitting her in vital parts of her body (see

10  LD 2 at 635-42), further shows premeditation and deliberation.  See, e.g., Herrera v.

11  Gipson, 2014 WL 289386, at *13 (C.D. Cal. 2014) (close-range killing without evidence of

12  struggle reasonably supports an inference of premeditation and deliberation); Meza v.

13  Yates, 2009 WL 1286222, at *10 (C.D. Cal. 2009) (evidence that "petitioner stabbed [the

14  victim] repeatedly-on her chest and face" sufficient to support finding that the attempted

15  murder was deliberate and premeditated).  Indeed, this evidence alone is sufficient to

16  support the jury's verdict.  See Davis v. Woodford, 384 F.3d 628, 640 (9th Cir. 2004), cert.

17  dismissed, 545 U.S. 1165 (2005) ("Under California law, when manner-of-killing evidence

18  strongly suggests premeditation and deliberation, that evidence is enough, by itself, to

19  sustain a conviction for first-degree murder.") (citation and internal quotation marks omitted);

20  Drayden v. White, 232 F.3d 704, 709 (9th Cir. 2000), cert. denied, 532 U.S. 984 (2001)

21  (same).

22       In sum, the California Court of Appeal's rejection of Ground One was neither contrary

23  to, nor an objectively unreasonable application of, any clearly established federal law, and

24  petitioner is not entitled to habeas relief on this claim.  See 28 U.S.C. 2254(d)(1).

25                    **CERTIFICATE OF APPEALABILITY**

26       Under the AEDPA, a state prisoner seeking to appeal a district court's final order in a

27  habeas corpus proceeding must obtain a Certificate of Appealability ("COA") from the district

28  judge or a circuit judge.  28 U.S.C. § 2253(c)(1)(A).  A COA may issue "only if the applicant

1  has made a substantial showing of the denial of a constitutional right."  Id. at § 2253(c)(2);

2  accord Williams v. Calderon, 83 F.3d 281, 286 (9th Cir.), cert. denied, 517 U.S. 1183

3  (1996).  "A petitioner satisfies this standard by demonstrating that jurists of reason could

4  disagree with the district court's resolution of his constitutional claims or that jurists could

5  conclude the issues presented are adequate to deserve encouragement to proceed further."

6  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003); see also Slack v. McDaniel, 529 U.S. 473,

7  483-84 (2000).

8        The Court reviewed petitioner's contentions and assessed their merits.  Petitioner

9  has not made a substantial showing of the denial of a constitutional right, as is required to

10  support the issuance of a certificate of appealability.  See 28 U.S.C. § 2253(c)(2).

11  Accordingly, the Court finds that a COA must be denied with respect to the instant Petition.

12                                          **CONCLUSION**

13        Based on the foregoing, IT IS ORDERED THAT:

14        1.      Petitioner's Petition for Writ of Habeas Corpus is hereby **denied**.

15        2.      Judgment shall be entered dismissing the action with prejudice.

16        3.      A Certificate of Appealability is **denied**.

17

18  DATED: December 12, 2014                          */s/ John E. McDermott*

19                                          JOHN E. MCDERMOTT
                                            UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28